**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **COURTROOM SCIENCES, INC.** | § | |
| | § | |
| **Plaintiff / Counter-Defendant,** | § | |
| | § | **CIVIL ACTION NO. 3:09-CV-251-O** |
| **vs.** | § | |
| | § | |
| **CINDY ANDREWS,** | § | |
| | § | |
| **Defendant/ Counter-Plaintiff.** | § | |

**MEMORANDUM OPINION AND ORDER**

**FOR PRELIMINARY INJUNCTION**

Before the Court is the motion of Plaintiff Courtroom Sciences, Inc. ("CSI") for a preliminary injunction against Defendant Cindy Andrews ("Andrews"). *See Doc. #15.* For the reasons set forth below, the motion is **GRANTED** as modified and set out in this **MEMORANDAM OPINION AND ORDER FOR PRELIMINARY INJUNCTION**.

I.     <u>BACKGROUND</u>

This case arises out of a contractual dispute between CSI and Andrews. Andrews was employed as a jury consultant for a number of years under a written contract with CSI ("the Andrews Contract"). She left that job abruptly and began working for a competitor, DecisionQuest.  Relevant details of the relationship, circumstances and events are set out as findings of fact below.

CSI filed this suit in state court on January 20, 2009, seeking declaratory and injunctive relief. *Doc. #1.* CSI complained of breaches in her contractual obligations regarding exclusivity of effort, *see Andrews Contract* , ¶¶ 2-4, ¶¶ 11-13; the

1

preservation of CSI-client relationships, *see Andrews Contract* ¶¶ 11-13;  a non-disclosure agreement, *see Andrews Contract* ¶ 10; a non-compete agreement, *see Andrews Contract* ¶ 17; a non-solicitation agreement, *see Andrews Contract* ¶ 18; a non-interference agreement, *see Andrews Contract* ¶ 19; and, the return of CSI property, *see Andrews Contract* ¶ 31. Based on these allegations, they requested protection of CSI's confidential client data[1] and trade secrets through a preliminary injunction pending final trial and resolution of the case. *Doc. #1.*

The state court entered a temporary restraining order on January 27, 2009. *Doc. #1.* The state court judge set a hearing to determine whether to extend that relief into a temporary injunction for February 9, 2009, at 11:00 a.m. in the 14th Judicial District Court of Dallas County, Texas. *Doc. #1.* However, on the morning of February 9, 2009, Andrews filed a Notice of Removal based on diversity jurisdiction, which placed the action before this Court. *Doc. #1.*

The Court then set a hearing for February 19, 2009, regarding CSI's motion for temporary injunctive. *See, e.g., Docs. #10, #15.* The hearing was conducted and evidence received. *Doc. #15.* This phase of litigation was conducted with the Texas Supreme Court set to issue a major opinion regarding the enforcement of restrictive covenants in employment contracts, and that decision was rendered April 17, 2009. *See Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 2009 Texas LEXIS 124 (Tex. April 17, 2009).  As discussed below, *Mann Frankfort* did *not* alter the trend toward enforcement that the Texas Supreme Court began in 2006. *See Alex Sheshunoff*

---

[1] "Confidential client data" is used in this opinion to refer to the bundle of identities, histories, preferences and proclivities contained in a client data base such as the one maintained by CSI.

*Mgmt. Servs., L.P. v. Johnson,* 209 S.W.3d 644 (Tex. 2006); *compare Light v. Centel Cellular Co.,* 883 S.W.2d 642 (Tex. 1994); *Martin v. Credit Prot. Ass'n,* 793 S.W.2d 667, 670 (Tex. 1990).

## II.   LEGAL STANDARD

The Fifth Circuit set out the requirements for a preliminary injunction in *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). The movant must show: (1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that granting the injunction is not adverse to the public interest. *Id.; see also Nichols v. Alcatel USA, Inc.,* 532 F.3d 364, 372 (5th Cir. 2008); *Sugar Busters LLC v. Brennan,* 177 F.3d 258, 265 (5th Cir. 1999); *Cherokee Pump & Equip. Inc. v. Aurora Pump,* 38 F.3d 246, 249 (5th Cir. 1994). .

The movant must clearly carry the burden of persuasion with respect to all four requirements in order to qualify for a preliminary injunction. *Karaha Bodas*, 335 F.3d 357, 363 *(5th Cir. 2003); Allied Mktg. Group, Inc. v. CDL Mktg., Inc.,* 878 F.2d 806, 809 (5th Cir. 1989); *Miss. Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 621 (5th Cir. 1985)). If the movant fails to establish any one of the four prerequisites to injunctive relief, relief will not be granted. *Women's Med. CTran. of Nw. Houston v. Bell,* 248 F.3d 411, 419 n.15 (5th Cir. 2001). Movants who obtain preliminary injunctions must post a bond to secure the non-movant against any wrongful damages it suffers as a result of the injunction. FED. R. Civ. P. 65(c).

The decision to grant or deny preliminary injunctive relief is left to the sound discretion of the district court. *Mississippi Power & Light Company v. United Gas Pipe Line Company,* 760 F.2d 618, 621 (5th Cir. 1985) (citing *Canal Authority of State of Florida v. Callaway,* 489 F.2d 567, 572 (5th Cir. 1974)). A preliminary injunction 'is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion.'" *White v. Carlucci,* 862 F.2d 1209, 1211 (5th Cir. 1989) (quoting *Holland Am. Ins. Co. v. Succession of Roy,* 777 F.2d 992, 997 (5th Cir. 1985)); see *also Allied Marketing Group, Inc. v. CDL Marketing, Inc.,* 878 F.2d 806, 809 (5th Cir. 1989). Even when a movant establishes each of the four *Canal* prongs, the decision whether to grant or deny a preliminary injunction remains discretionary with the court. *Mississippi Power & Light,* 760 F.2d at 621. The decision to grant a preliminary injunction is to be treated as the exception rather than the rule. *Id.*

III.   **ANALYSIS**

The Court must first set forth its findings of fact and conclusions of law with sufficient particularity to provide a basis for appellate review. *Allied Marketing Group, Inc. v. CDL Marketing, Inc.,* 878 F.2d 806, 810 (5th Cir. 1989). The events giving rise to this dispute were exhaustively examined in the February 19 hearing, during which the Court received evidence from a number of witnesses, had the opportunity to consider their demeanor, and reviewed a substantial set of documents.

The findings below summarize the key determinations reached by the Court on that basis. The Court finds that:

A.      **FINDINGS OF FACT**

1.  Plaintiff CSI is a Texas corporation with a principal place of business in Irving, Texas. Transcript of February 19, 2009 Hearing, 229/1 to 229/5 (hereinafter cited as "Tran. __/__ to __/__").

2.  CSI engages in trial sciences consultancy, including counsel and training for attorneys and companies regarding jury psychology, witness effectiveness, training protocol, jury profile research design, mock trial methodology, and means of forecasting damages and other outcome probabilities. Tran. 332/22 to 333/7.

3.  Trial sciences consultancy consists of a body of methodologies and beliefs about which opinions differ among practitioners when debating particular techniques, suppositions and conclusions. *See*, Tran. 136/19 through 137/8; Tran. 155/9 through 157/19; Tran. 337/9 through 340/8; Doc. # 34 ("Defendant's Notice of Supplemental Exhibits to Hearing on Preliminary Injunction"); Defendant's Exhibit 3.

4.  The trial consultancy industry exists in a market that is national in scope and very competitive among a relatively small number of firms. Tran. 234/1 to 234/22.

5.  The practices, concerns and ethics regarding client confidentiality within the trial consultancy industry reflect and in certain instances are necessarily an extension of those found in the inter-related field of legal representation. *See* Tran. 233/2-21.

6. Defendant Cindy Andrews (hereinafter "Andrews") is a trial consultant who lives and works out of Illinois in the greater Chicago area. Tran. 308/4 through 309/4.

7. Andrews has a Bachelor's Degree in Psychology, a Master's Degree in Clinical  Psychology, an MA in Clinical Psychology, an MS in Clinical Psychology, and a Doctorate in  Clinical Psychology. Tran. 133/22 through 134/11; Defendant's Exhibit 1.

8. Andrews first worked as a trial consultant when recruited to the profession by a company called Trial Graphix. Tran. 134/12 through 138/6; Defendant's Exhibit 1.

9. Andrews participated in a formal training program at Trial Graphix; she also learned the craft of trial sciences on the job and from industry recognized publications and practices. Tran. 134/12 through 138/6.

10. Andrews left Trial Graphix and became employed by CSI, Tran. 140/12 to 140/14, from December 6, 2004 to January 17, 2009. Tran. 140/12-19; Defendant's Exhibit 1.

11. Andrews brought no clients with her from Trial Graphix to CSI. Tran. 131/2-15.

12. Andrews was employed by CSI under the afore-described Andrews Contract. *See* Andrews Contract.

13. Disregarding the noncompete covenant, the Court finds that an otherwise enforceable agreement existed between Andrews and CSI as each party exchanged multiple enforceable promises within the Andrews Contract. *Id.*

14. CSI's disclosures to her of confidential matters gave rise to their interest in the restrictive covenants, and these covenants themselves were designed to enforce that interest and her agreement to fiduciary status. *See* Andrews Contract, and discussion below.

15. Andrews resigned from CSI by email on Saturday, January 17, 2009, sent around 10:45 pm on that date. Tran. 71/3-6.

16. DecisionQuest formally employed Andrews on Monday, January 19, 2009. Tran. 69/13-22.

17. Andrews' education has assisted her in her work as a trial consultant. Tran. 134/2-4.

18. Andrews received on-the-job training with CSI.  Tran. 122/33 through 123/8.

19. Andrews training included witness preparation techniques developed by CSI and unique to CSI. Tran. 333/20 through 337/8.

20.  Andrews provided training to employees while at CSI. 132/16 through 133/12; 346/22 through 348/15.[2]

21. CSI's confidential information and trade secrets includes its marketing trade secrets as well as jury science trade secrets. Tr 235/1 to 235/7.

---

[2] The parties fought to characterize this event as valuable (Andrews) or literally laughable (CSI). The point is that she did make a presentation. Andrews considered it in light of how it addressed overcoming objections to the value of jury science consulting; CSI considered it in light of how it addressed cold call sales. Its value is of no consequence in resolving the present issues.  Similarly, Andrews characterizes her CSI training as useless while CSI considered it valuable. Again, the fact it was given as promised matters; the actual value does not.

22. CSI maintains a confidential database on 15,000 lawyers who are past, present or potential clients. Tr 235/8 to 235/14.

23. CSI's attorney database includes the specific trial technique preferences, case histories and selling points with respect to the attorney-clients within it and what they want from a trial consultancy. Tr 305/2 to 305/25.

24. CSI's client database includes information that is not available on the internet or by other open source research. Tr 301/17 to 301/20.

25. CSI has invested a significant amount of money and time establishing, updating, and maintaining the database. Tr 235/17 to 235/23.

26. CSI maintains security protocols for the databases afore-described, insofar as:

   a. CSI provides access to its databases only to specific CSI employees;

   b. CSI's information technology department (hereinafter, "IT") requires active acknowledgments every time an individual logs on to their system that inform the individual the data and information contained are trade secrets and proprietary;

   c. CSI maintains magnet locks on the building;

   d. CSI maintains keyed areas allowing access to certain areas to only certain people;

   e. CSI uses encryption software;

   f. CSI's IT maintains strict protocols as to access to information;

g.  CSI maintains physical premises security, including cameras; and,

h.  CSI's Employee Manual and Employment Agreements are issued
    subject to the acknowledgement that information within is
    proprietary and confidential.

*See e.g.,* Tr 235/8 to 235/14 ; Tran. 245/22 through 249/7; Tr 255/2 to
    255/25.

27. Andrews had access to the CSI client database during her employment
    with Plaintiff. Tr 237/11 to 237/21.

28. CSI's client prospect lists are confidential and subject to the same internal
    security restrictions as the current / past client database. Tr 237/11 to
    237/21.

29. Andrews had access to the CSI client prospect list during her employment
    with Plaintiff. Tran. 237/11 to 237/21.

30. Andrews was introduced to a number of clients and prospective clients
    as part of her job with CSI, including trial attorneys and industry-leading
    companies with regular need for jury science consultancy.

31. Andrews' contract with CSI specifically states that "[i]n return for
    [Andrews'] agreement not to use or disclose [CSI's] trade secrets,
    training and customer lists, [CSI] unconditionally promises to give,
    during the training period [to Andrews] its trade secrets, specialized
    training, customer/client [sic.], lists of prospective clients and customer
    lists and other confidential proprietary business methods during the
    training period." Doc. 2-4, at 18, ¶ 8.

32. Andrews' agreement with CSI regarding restrictive covenants was very specific, in that CSI promised "to give this confidential information to [Andrews] whether or not [her] employment with [CSI] ends for any reason, including but not limited to, [Andrews] quitting working for [CSI] soon after [the] Agreement [was] signed and before the end of the training period." Andrews Contract ¶ 9.

33. The Andrews Contract promised delivery of the confidential information to her from CSI even if Andrews was fired for cause after signing the agreement. Andrews Contract, ¶ 9.

34. For her part, Andrews promised:

  a. *Exclusivity of effort:* She would devote her professional time and talent solely to the benefit of CSI and not to a competitor; Andrews Contract, ¶¶ 2-4, 11-13.

  b. *Preservation of CSI-client relationships:* She would conduct herself so as to build a "special relationship of trust and confidence" and maintain "goodwill" among CSI, herself and CSI clients, recognizing that she was a "significant contact" between CSI and their clients. Andrews Contract ¶¶ 11-13.

  c. *Non-disclosure agreement:* She would not disclose any of the confidential information she obtained working for CSI, maintaining the confidentiality of both database information and technical trade secrets. Andrews Contract ¶ 10.

    d.   *Non-compete agreement:*  For a post-employment period of two years, she would not individually or with others compete by activity or ownership in the provision of trial science consultancy in any territory in which she had solicited customers or provided such services during the final two years that she was employed by CSI. Andrews Contract ¶ 17.

    e.   *Non-solicitation agreement:* For a post-employment period of two years, she would not solicit business in trial science consultancy from a current CSI client or from anyone she had contacted regarding provision of her services during the final two years that she was employed by CSI. Andrews Contract ¶ 18.

    f.   *Non-interference agreement:* For a post-employment period of two years, she would not attempt to hire away CSI employees or otherwise interfere with existing employment relationships within CSI. Andrews Contract ¶ 19.

    g.   *Return of CSI property:* She would return to CSI within 24 hours of employment termination any reports, information, property or other materials she possessed or controlled as a result of her employment by CSI. Andrews Contract ¶ 31.

35.  By November 2008, Andrews had developed substantial resentment over what she believed to be unfair treatment by CSI in compensation, status and respect. Tran. 172/13 through 174/15.

36.  By November 2008, Andrews was very dissatisfied with how CSI
     conducted its business based on her opinions as to proper professional
     and ethical practices. Tran. 154/4 through 158/19.

37. Andrews signed a contract for employment by DecisionQuest on
    December 29, 2008. Tran. 67/17-18.

38. From that date until her email resignation from CSI on January 17, 2009,
    Andrews was devoting professional time and attention to the agreed
    move into employment with DecisionQuest, including active
    coordination of equipment, materials and arrangements for
    DecisionQuest client activity so that she could "hit the ground running,"
    in violation of her contractual obligation to devote her professional time
    and attention to CSI and the clients to which she was assigned during
    that period. *See* Tran. 67/17 through 74/20; Tran. 78/6 through 87/19;
    *compare* Andrews Contract, ¶¶ 2-4, 11-13.

39. Andrews managed her departure in a way that disrupted existing CSI-
    client relationships by leaving them abruptly, without notice, and unable
    to manage the transition of her cases to another consultant smoothly, in
    violation of her contractual obligation to devote her professional time
    and attention to CSI during that period, and in violation of her
    contractual obligation to utilize her connection to CSI clients to preserve
    the goodwill between CSI and those clients. Tran. 67/17 through 74/20;
    Tran. 78/6 through 87/19; Tran. 89/6 through 91/20; Tran. 102/14
    through 107/6; Tran. 211/20 through 216/14; Tran. 245/22 through

249/7; 272/23 through 285/8; *compare* Andrews Contract, ¶¶ 2-4, 11-13.

40. In one instance, Andrews deliberately misled CSI into a situation where it assumed she would be handling a client matter when she knew they would need to make arrangements for someone else to handle it as she would be working for DecisionQuest by that time. Tran. 89/6 through 91/20; *compare* Andrews Contract, ¶¶ 2-4, 11-13.

41. Andrews' deliberate manner of departure seriously damaged CSI's relationships with a number of clients.  Tran. 272/23 through 285/8.

42. Andrews provided insider-information regarding pricing to DecisionQuest with regard to two major CSI clients, in violation of her contractual obligation to preserve confidential information and trade secrets received as an employee of CSI. Tran. 102/14 through 107/6; *compare* Andrews Contract ¶ 10.

43. Andrews helped DecisionQuest structure contracts with those clients that mirrored the same terms as those negotiated with CSI, based on her inside knowledge of the information, so as to take that business from CSI with her to DecisionQuest. Tran. 102/14 through 107/6; *compare* Andrews Contract ¶ 10, ¶¶ 17, 18.

44.  These clients are highly confidential,[3] but would be considered industry leaders likely to generate tremendous income for their contractual partners.[4]

45.  Andrews contacted CSI clients to notify them of her resignation, thereby continuing her professional relationship with those clients apart from her CSI affiliation, in violation of her contractual obligation to avoid solicitation of CSI clients on behalf of her new employer. Tran. 102/14 through 107/6; *compare* Andrews Contract ¶¶ 17, 18.

46.  Andrews failed to return CSI property in violation of her contractual obligations. *See, e.g.,* Tran. 211/20 through 216/14; Tran. 245/22 through 249/7; *compare* Andrews Contract ¶ 31.

47.  Andrews retained a great deal of physical and electronic material that was confidential and/or property of CSI, after her resignation. Tran. 107/2 through 130/11; *compare* Andrews Contract ¶ 31.

48.  From the testimony and her demeanor the Court has no confidence that she could account for it all on the day of the hearing. *Id.*

49.  Based on Andrews' testimony and demeanor in combination with CSI's direct evidence, *see* Tran. 8/9 through 62/4, it is apparent that the day she resigned she downloaded and retained a certain body of electronic information from CSI database that was highly confidential, later moved

---

[3] The identities of the clients were revealed to the Court by a filing under seal for purposes of in chambers review.  See Tran. 374/24 through 383/2. The referenced clients are "household names."

[4] *Id.*

to one or more other devices.[5] *See* Tran. 21/15 through 55/1; Tran. 71/7 through 72/11; Tran. 187/2 through 190/85; Tran. 191/15 through 192/9.

50. Andrews carefully and successfully negotiated a contract with DecisionQuest that guaranteed she would not suffer a professional or financial loss if CSI was able to enforce the terms of her contract with them. Tran. 63/18 through 67/18.

51. Andrews will be able to work as a jury consultant for DecisionQuest without working for CSI clients or utilizing her knowledge from the CSI database as to the particular requirements of prospective clients identified and detailed in that database.  *Id.*

52. Andrews would have other work and satisfactory compensation available with DecisionQuest even if she were unable to work specifically as a jury consultant. *Id.*

---

[5] While CSI's proof was not strong, *see* Tran. 21/15 through 55/1, the testimony of Andrews herself, and her demeanor on the stand, carried that proof the rest of the way to making this a finding of fact. *See* Tran. 71/7 through 72/11; Tran. 187/2 through 190/85; Tran. 191/15 through 192/9. The witness' textbook equivocation during this exchange, for example, did not provoke confidence in her demurrer:

> Q.     Okay.  Now, January 17th, '09, it says defendant downloads files from CSI's laptop to defendant's backup drive; is that accurate?
> A.     *I don't recall that happening.*
> Q.     Is it your testimony from this Court that you did not download files from CSI's laptop to I believe it's a Maxtor hard drive?
> A.     *I don't believe I downloaded them* on the 17th, but I did download my personal file.  It was one folder, my personal folder, that had my own library of professional information in it.

Tran. 71/7-17 (emphasis added).

53. CSI's means of protecting its legitimate trade secrets and confidential client data was through the non-disclosure, non-compete, non-solicition, and non-interference clauses of the Andrews Contract. Andrews Contract ¶¶ 10, 17, 18, 19.

54. These limitations were agreed to by Andrews in exchange for CSI's binding promise to provide her with the confidential client data and trade secrets. Andrews Contract ¶ 9.

55. The Andrews Contract's non-compete restrictions are intended to be cumulative and are:  (a) geographically defined ("any territory in which [she] solicited customers or provided or sold services" on behalf of CSI during the two years before January 17, 2009), *see* Andrews Contract ¶ 17; and, (b) identified with specific persons / entities ("any person or company" that she "personally contacted, solicited, serviced, or sold service to as" a CSI employee during the two years before January 17, 2009), *see* Andrews Contract ¶ 17.

56. CSI has not established the specific geographical zones that would be affected by granting the relief it seeks, identifying only the Chicago, Illinois "territory" as "one of them." Tran. 308/12-14. However, the borders of that territory were not defined. *See, id.*

57. The Andrews Contract itself establishes by description the specific persons and entities affected under the non-compete clause, *see* Andrews Contract ¶ 17, and CSI has provided the identities of those described by a submission to the Court under seal, *see* Tran. 374/24 through 383/2.

58. The Andrews Contract's non-solicitation restriction covers anyone who "was a CSI customer [and thus someone about whom information exists within CSI's electronic databases and institutional internal knowledge that is not publicly available], or who Andrews contacted, solicited, sold services or provided services while employed by CSI." Andrews Contract ¶ 18.

59. The Andrews Contract's non-disclosure restrictions are specific and cover all confidential information, including identity of customers and prospects; special needs of customers; confidential market studies; pricing studies, information, and analyses; business projections; financial information; special procedures and services of CSI; customer databases, employer manuals; contracts; fee arrangements; correspondence with clients and prospective clients; profiles of CSI; profiles of clients; marketing strategies; CSI reference materials; activity reports; and other SCI training and materials. Andrews Contract ¶ 10.

60. The Andrews Contract's non-inteference restrictions prohibit direct or indirect involvement in recruiting CSI employees to work for anyone else. Andrews Contract ¶19.

**B.     ANALYSIS**

**1.** *Likelihood of Success*

The Court turns to the standards of the substantive law in order to determine the likelihood of success on the merits. *See Roho, Inc. v. Marquis,* 902 F.2d 356, 358 (5th Cir. 1990). The movant's likelihood of success must be more than negligible to

prevail on a preliminary injunction, *Compact Van Equipment Company, Inc. v. Leggett & Platt, Inc.,* 566 F.2d 952, 954 (5th Cir. 1978), and a preliminary injunction should not be granted unless the question presented by the litigant is free from doubt, *Congress of Racial Equality v. Douglas,* 318 F.2d 95, 97 (5th Cir.), *cert. denied,* 375 U.S. 829, 84 S. Ct. 73, 11 L. Ed. 2d 61 (1963). However, the degree of persuasion necessary on the substantial likelihood of success factor may decrease as the level of persuasion in relation to the other three factors increases. *See Productos Carnic, S.A. v. Central American Beef and Seafood Trading Company,* 621 F.2d 683, 686 (5th Cir. 1980) ("Where the other factors are strong, a showing of some likelihood of success on the merits will justify temporary injunctive relief.").

The various causes of action presented by CSI revolve around the danger of Andrews disclosing information she obtained in confidence while their employee. Former employees are bound under Texas law to maintain confidential information and trade secrets gained while employed by the affected company whether there is a contractual restriction or not. *See Propath Serv., L.L.P. v. Ameripath, Inc.,* 2004 U.S. Dist. LEXIS 27846, *8 (N.D. – Tex. October 21, 2004), and cases cited therein. CSI has expressed particular concern over its client data. Information pertaining to pricing, preferences, credit histories, decision makers, and other details regarding clients all fall within the ambit of trade secrets and confidential information, as do leads on potential clients. *See, e.g., Bertotti v. C.E. Shepherd Co., Inc., 752 S.W.2d 648, 654* (Tex. App.--Houston [14th Dist.] 1988, no writ; *Wright Hydraulics, Inc. v. Womack Mach. Sup. Co., 482 S.W.2d 34, 39* (Tex. Civ. App.--Fort Worth 1982, no writ); *Grace v. Orkin Exterminating Co., 255 S.W.2d 279, 288* (Tex. Civ. App.--Beaumont 1953, ref n.r.e.) ;

18

*Johnston v. Am. Speedreading Academy, Inc., 526 S.W.2d 163, 165* (Tex. Civ. App.--

Dallas 1975, no writ).

Analysis begins by reference to the Andrews Contract to determine whether

an otherwise enforceable agreement existed between the parties if the restrictive

covenants are disregarded. *Ray Mart, Inc. v. Vybiral,* 2008 U.S.App.LEXIS 22882, *6

(5th Cir. 2008) (unpublished). Because the parties exchanged mutually enforceable

promises within that agreement (e.g., regarding venue in event of dispute, Andrews

Contract ¶ 37), rendering this an otherwise enforceable agreement, the Court next

moves to consider the validity of the restrictive covenants themselves. *Id.* *6-8.

CSI's disclosures to her of confidential matters gave rise to their interest in

the restrictive covenants, and these covenants themselves were designed to enforce

that interest and her agreement to fiduciary status. See *Id.* at *10 and cases cited

therein. CSI seeks an injunction enforcing fiduciary covenants of non-competition,

non-solicitation, non-interference and non-disclosure. The contract provides that

Texas law governs and neither side disputes this. Therefore, to determine CSI's

likelihood of success, the Court will examine the requirements for enforcement of

these covenants under the law of that state.

Texas governs covenants not to compete ("non-competes") under its

Business and Commerce Code. TEX. BUS. & COM. CODE § 15.50. Section 15.50 of that

Code provides that  "a covenant not to compete is enforceable if it is ancillary to or

part of an otherwise enforceable agreement at the time the agreement is made to

the extent that it contains limitations as to time, geographical area, and scope of

activity to be restrained that are reasonable and do not impose a greater restraint

than is necessary to protect the goodwill or other business interest of the promisee."
*Id.*

The parties do not contest, and indeed both reference, the written Andrews Contract as the basis of her relationship with CSI. Further, neither contests, and an examination of the contract itself reveals, that the Andrews Contract is an "otherwise enforceable agreement" when read with the restrictive covenants excised, leaving then the issue of whether the restrictive covenants themselves are valid. If they are, then they are enforceable within limitations of time, geography and activities that are reasonably restrained in light of what's necessary to protect "the goodwill or business interest of the promisee." *Id.*

A Texas non-compete agreement is enforceable if the promisor exchanges confidential information that gives rise to its interest in restraining competition from the promisee and the non-solicitation covenant is designed to enforce non-disclosure. *Guy Carpenter & Co. v. Provenzale,* 334 F.3d 459, 466 (5th Cir. 2003). For example, payment of $35,000 to obtain the employee's agreement to a modification of the employment contract is a non-illusory promise that supports a non-compete agreement. *See Provenzale*, 334 F.3d at 459.

Both non-solicitation and non-interference agreements restrain trade and are treated as covenants not to compete under Texas law. *See Miller Paper v. Roberts Paper Co., 901 S.W.2d 593, 599)(Tex. App. -- Amarillo 1995, no writ)*. "[T]he fundamental legitimate business interest that may be protected by [post-employment fiduciary] covenants is in preventing employees or departing partners from using the business contacts and rapport established during the relationship of

representing the accounting firm to take the firm's customers with him." *Peat Marwick Main & Co. v. Haass, 818 S.W.2d 381, 34 Tex. Sup. Ct. J. 784 (Tex. 1991).*

Nondisclosure agreements are not always seen as restraints of trade in Texas law. *See Guy Carpenter & Co. v. Provenzale, 334 F.3d 459 at 463; Oxford Global Resources, Inc., v. Weekley-Cessnun,* 2005 U.S. Dist. LEXIS 1934, *6 (N.D. – Tex. February 8, 2005). However, they are treated like non-compete agreements when the practical effect of the nondisclosure covenant prohibits the former employee from competing against the former employer and using the general knowledge acquired in that employment. *See Oxford Global,* 2005 U.S. Dist. LEXIS 1934 at *7 (citing *ZEP Manufacturing Co. v. Harthcock,* 824 S.W.2d 654, 663 (Tex. App.- Houston [1st Dist.] 1988, no writ)).

The Court will therefore apply the same analysis to each of the restrictive covenants that CSI seeks to apply.

Each clause is ancillary to Andrews' otherwise enforceable contract of employment. The Texas Supreme Court has held that non-competes signed by at-will employees are unilateral contracts, formed upon signature, and made binding when the subject employee is provided with confidential information. *Sheshunoff Management Services, L.P. v. Johnson*, 209 S.W.3d 644, 651 (Tex. 2006). In this case, it is known that at least one crucial bit of confidential information – the pricing preferences of a large client – was obtained by Andrews in the course of her CSI employment. *Tran. 104/25 through 107/1.* Under *Sheshunoff,* she was then bound by the terms of the non-compete.

*Sheshunoff* reversed an old rule that a non-compete agreement was enforceable only if the at-will employee's signature on the contract entitled her to the benefits of a promise from the employer.  *Sheshunoff,* 209 S.W.3d 644, 651 (Tex. 2006); *compare Light v. Centel Cellular Co.*, 883 S.W.2d 642 (Tex. 1994).  *Sheshunoff* enforced a restrictive covenant that was entered into by the employee in exchange for the employer's promise to deliver access to confidential information or methods provided the employer had delivered. *Sheshunoff,* 209 S.W.3d 644, 651.

The Texas Supreme Court recently emphasized that enforceability with *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 2009 Texas LEXIS 124 (Tex. April 17, 2009).  Unlike the situation here, and in *Sheshunoff,*  in *Mann Frankfort* the employer made no promise to provide access to confidential information – indeed, made no promise at all in exchange for the accountant-employee's agreement of non-disclosure. *Mann Frankfort*, 2009 Texas LEXIS 124, *13. The *Mann Frankfort*  Court found nonetheless that because access to that information was necessary for the professional to do his job, it was an implied promise, and further it was a promise that was fulfilled on the first day the employee reported to work. *Id. *13-19.* Consequently, the restrictive covenant was enforceable. *Id.*

The Andrews Contract was well drafted and its restrictive covenants would have survived scrutiny even under *Light;* certainly under *Sheshunoff,* now expanded by *Mann Frankfort*. The Andrews Contract contained provisions that entitled her to learn the trade secrets of CSI once she had signed the agreement, *regardless* of whether she left shortly thereafter, and indeed *regardless* of whether she was fired for cause. Andrews Contract ¶9.  If she had quit on the second day of employment,

this contract would require CSI to provide her with the training, other trade secrets, and confidential information promised, simply because she had shown up. These binding promises from CSI, effective upon her signature on the contract, were not illusory as that concept was used in *Light,* and they certainly pass muster under *Sheshunoff* and *Mann Frankfort.*

The Court now turns to the prohibitions on activity specified in the Andrews Contract's restrictive covenants. CSI seeks enforcement of the Andrews Contract, in which the restrictive covenants revolve around geography, confidential information, and CSI-client relationships.

Both CSI and DecisionQuest have a national practice as that is the nature of their business. A nationwide limitation "sensibly comports' with a business of "national character." *Vais Arms, Inc. v. Vais,* 383 F3d 287, 295 (5th Cir. 2004). The jury sciences industry revealed in the evidence before the Court is information and service based with little regard to physical geography. The paradox that emerges is that CSI is entitled to a national reach in regulating Andrews' impact on their business, insofar as it relates to matters her contract detailed as off-limits, yet it would be over-reaching to make any blanket prohibition on *any* practice of her profession in any specific geographical area. *See, Transperfect Translations, Inc. v. Leslie,* 2009 U.S. Dist. LEXIS 1541 (January 12, 2009). That is particularly the case when no territory has been clearly identified and defined.

The Court would have concerns remaining under Tex. Bus. & Com. Code Ann. § 15.51(c) about the national scope of the application of her non-compete clause, *id., see also, Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 663 (Tex.

1990), but under the terms of her new contract Andrews will still have employment with her new company and income commensurate with her experience and skill regardless of the clause.[6] In the Preliminary Injunction set out below,[7] the national reach of that scope does not preclude jury and trial science consultancy within the United States, but only one that would violate the terms of her agreed restrictive covenants because of an abuse of her past CSI-client relationships or her disclosure of CSI confidential information. The injunction as ordered thus allows her "to work

---

[6] It is instructive that the logical outcome of this litigation – the enforcement of CSI's restrictive covenants against Andrews – places the costs on the non-party, DecisionQuest, and not on Andrews (as she has been virtually indemnified through her agreement with DecisionQuest). Given that DecisionQuest and Andrews foresaw this result, and specifically bargained to accommodate it, force of logic further suggests that DecisionQuest obtained the balance of the benefits of this bargain when their competitor CSI lost its contracts with two major sources of continuous income. DecisionQuest noted their own previous relationships with those clients, *see* Tran. 356/10 through 359/18, but that was not the point of the violated covenants, nor the competitive benefit DecisionQuest obtained: the loss of any relationship between CSI and those clients. That conclusion comports well with the evidence and testimony put before the Court on February 19, 2009. DecisionQuest's demurrer rings hollow, particularly in light of this testimony from DecisionQuest's Chief Operating Officer, Michael Cobo:

> Q.    Okay.  You wouldn't have gotten the particular piece of business for [a CSI client], but for the fact that Cindy Andrews came over to DecisionQuest, correct?
> A.    I don't know that for a fact, if she had not reacted to the client.  I don't know.
> Q.    My point is, it's true, isn't it, that you wouldn't have gotten that particular piece of business over at CSI  unless Cindy Andrews had come over to DecisionQuest, correct?
> A.    In that particular engagement, I believe that's true.  We were trying to react to the client need to prepare a witness for an upcoming trial.

> Tran. 371/10-15.

[7] Courts are empowered – indeed, required – to rewrite otherwise valid restrictive covenants to as to tailor them narrowly in meeting the legitimate interests of the protected without depriving the market of services that may be offered without damage to those interests. *See, e.g., Staples, Inc. v. Sandler,* 2008 U.S. Dist. LEXIS 68589, *9-14 (N.D.—Tex. August 29, 2008). In this instance, the nature of the market concerned is such that a blanket geographical prohibitions without qualifications would not seem appropriate under that standard.

in the field where [her] experiences lies, earn [her] living, but will give effect to" the

bargain she made. *Nexstar Broadcasting Group, Inc., v. Duane Lammers,* 2008 U.S.

Dist. LEXIS 49888, *11 (N.D. – Tex. June 27, 2008)*.

The Court turns now to consider whether CSI is seeking to protect trade

secrets rather than information not subject to privilege or protection. The Texas

Supreme Court applies six factors to discern the existence of a trade secret: (1) the

extent to which the information is known outside of his business; (2) the extent to

which it is known by employees and others involved in his business; (3) the extent

of the measures taken by him to guard the secrecy of the information; (4) the value

of the information to him and to his competitors; (5) the amount of effort or money

expended by him in developing the information; (6) the ease or difficulty with which

the information could be properly acquired or duplicated by others. *In re Bass,* 113

S.W.3d 735, 739 (Tex. 2003).

The CSI client data details are not known outside of CSI and only known by a

select few within it. Tran*. 235/1-23; 255/2-25; 305/2-25.* Likewise, the CSI method

of witness preparation is not known outside of CSI and taught only to professionals

working for it. Tran. 335/2 through 340/8. CSI's special pricing arrangements with

major clients are a type of trade secret commonly used in commerce and recognized

as confidential by law. *See, e.g., Nexstar Broadcasting Group, Inc., v. Duane Lammers,*

2008 U.S. Dist. LEXIS 49888 (N.D. – Tex. June 27, 2008).

CSI has taken significant steps to guard these bodies of information. Andrews

herself acknowledged the value of the information in her written contract, and CSI

has presented evidence emphasizing that value. The CSI client database is the

product of the lifetime of that firm and could not be acquired or duplicated by anyone who had not been with CSI during at least part of its history.

CSI is likely to succeed on the merits of enforcing the restrictive covenants in the Andrews Contract when a decision is made on a permanent injunction. The Court now examines whether CSI is likely to succeed on their substantive causes of action.

### a. Breach of Contract

CSI is likely to succeed on the merits of this case as the facts depict a breach of contract with substantial clarity. Breach of contract is actionable when: (1) there is a valid contract; (2) the aggrieved party has performed or tendered performance; (3) the defendant has breached the contract; and, (4) the aggrieved party has suffered damages. See, *e.g., Recursion Software, Inc. v. Interactive Intelligence, Inc.,* 425 F. Supp. 2d 756, 781 (N.D. Tex. 2006) (citing *Dorsett v. Cross,* 106 S.W.3d 213, 217 (Tex. App.--Houston [1st Dist] 2003, pet. denied)); *Durham v. Saenz*, 2009 Tex. App. LEXIS 114, **8-9 (Tex. App. -- Corpus Christi 2009); *Valero Marketing & Supply Co. v. Kalama Int'l,* 51 S.W.3d 345, 351 (Tex.App.--Houston [1st Dist.] 2001, no pet.).

The parties agree they are subject to a valid contract. CSI has tendered performance by compensation and by training and an expansion of professional contacts. Significantly, CSI also gave Andrews the promised training and the promised access to company secrets that was the formal inducement for her entry into the contract's post-employment restrictive covenants.

Andrews breached the contract by: essentially working for DecisionQuest during her last days under contract with CSI; providing DecisionQuest with inside

information on CSI client pricing preferences; maintaining her CSI client contacts,

obviously looking to carry some of those into DecisionQuest; and, departing CSI in a

manner calculated to create maximum disruption of CSI's relationships with its

clients. *Tran. 70 / 2 -12; Tran. 72 / 16-25; Tran. 74 / 5 through Tran. 76 / 11; 98 / 19*

*through 99 / 10; Tran. 78 / 6 through 82 / 17; 84 / 10 through 95 / 24.; 98 / 19*

*through 99 / 10; 98 / 19 through 102 / 13; 104 / 25 through 108 / 12.* Further, she

retained confidential documents and CSI property well past the twenty-four hour

period in which the contract required in its provisions for a more orderly departure.

*Tran. 111/18 through 120/10; Tran. 126/1-20.*

   In addition, CSI has suffered damages as a result of her breach of this

contract. *Tran. 275/11 though Tran. 285/9.*

   **b. Breach of the Common Law Duty of Confidentiality**

   CSI is also likely to succeed on the merits of this case as the facts depict a

breach of a common law duty of confidentiality with substantial clarity. Texas

common law attaches certain duties of confidentiality to any written employment

contract. *Lucous v. J.C. Kinley & Co.,* 376 S.W.2d 336, 338 (Tex. 1964); *Miller Paper Co.*

*v. Roberts Paper Co.,* 901 S.W.2d 593, 601 (Tex. App. – Amarillo 1985, no writ). The

former employee may use the general knowledge and the benefit from experience

that she developed working with her former employer. *Id.* However, she may not

use confidential information or trade secrets she came to know during that time. *Id.*

   The existence and terms of the written contract are undisputed.

Andrews has used confidential information that she learned while working for CSI. *See, e.g., Tran. 104/25 through 107/1.* CSI suffered commercial injuries as a result. *Tran.  165/19 through 166 /18; Tran. 275/11 through 282/16*

### c. Breach of Fiduciary Duty

CSI is also likely to succeed on the merits of this case as the facts depict a breach of fiduciary duty with substantial clarity. An actionable breach of fiduciary duty is found when: (1) a fiduciary relationship exists or existed between the plaintiff and defendant; (2) the defendant breached that fiduciary duty to the plaintiff in the course of its existence; and (3) the defendant's breach caused injury to the plaintiff or benefit to the defendant. *Navigant Consulting, Inc. v. Wilkinson,* 508 F.3d 277, 283 (5th Cir. 2007).

A formal fiduciary relationship existed between Andrews and CSI by the terms of her contract. *See Abetter Trucking Co. v. Arizpe,* 113 S.W.3d 503, 508 (Tex. App.--Houston [1st Dist.] 2003, no pet.).  A fiduciary relationship also existed between Andrews and CSI by the nature of her agency on their behalf in securing and preserving clients and their good will. *See Molex, Inc. v. Nolen,* 759 F.2d 474, 479 (5th Cir. 1985); *Kinzbach Tool Co. v. Corbett-Wallace Corp.,* 160 S.W.2d 509, 513 (Tex. 1942). This fiduciary relationship required Andrews to act primarily for the benefit of her employer, CSI, to deal fairly with that employer, and to fully disclose matters that would affect CSI's business, while still employed by CSI. *Navigant Consulting, Inc., v. Wilkinson*, 508 F.3d 277, 283-84 (5th Cir. 2007).

Andrews breached this fiduciary duty during the course of its existence. *Tran. 70 / 2 -12; Tran. 72 / 16-25; Tran. 74 / 5 through Tran. 76 / 11; 98 / 19 through 99 /*

*10; Tran. 78 / 6 through 82 / 17; 84 / 10 through 95 / 24.; 98 / 19 through 99 / 10; 98 / 19 through 102 / 13; 104 / 25 through 108 / 12.* Andrews' breach caused injury to CSI as well as a substantial benefit to herself. *Tran.  165/19 through 166 /18; Tran. 275/11 through 282/16.* She obtained a "fail-safe" contract insuring her income regardless of the result of this anticipated litigation. *See Tran. 65/5 through Tran. 68/2.*

### d. Tortious Interference with Contract

CSI is also likely to succeed on the merits of this case as the facts depict a tortious interference with contract with substantial clarity. Tortious interference with contractual relations is found when: (1) there was a contract subject to interference; (2) the act of interference was willful and intentional; (3) actual damage or loss occurred; and (4) Defendant's act of interference was a proximate cause of plaintiff's damages. *Juliette Fowler Homes, Inc. v. Welch Associates, Inc.,* 793 S.W.2d 660, 664 (Tex. 1990).

A number of contractual relationships between CSI and major clients were unilaterally terminated upon Andrews' abrupt departure. *Tran.  165/19 through 166 /18; Tran. 275/11 through 282/16.* Andrews' interference with or deliberate disruption of those contracts was willful and intentional. *Id.* Her interference with those contracts damaged CSI. *Id.*

### 2. *Irreparable Injury*

An irreparable injury is one that cannot be remedied by an award of economic damages. *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328,

338 (5th Cir. 1981).  The injury in question must be imminent and cannot be speculative. *See Watson v. FEMA,* 437 F. Supp. 2d 638, 648 (S.D. Tex. 2006).

The loss of confidential business information by dissemination by ex-employees is a particularly acute injury not susceptible to purely financial compensation. *See Oxford Global Resources, Inc. v. Michelle Weekley-Cessnun,* 2005 U.S. Dist. LEXIS 1934, *9-10 (N.D.—Tex. February 8, 2005).  CSI's history is not unusual, since a company that provides professional and technical consultation "invests substantial resources in computer databases and written materials containing information about Clients and Contractors, and in training its personnel to utilize this information," ultimately possessing "confidential methods for conducting practically every aspect of its business." *See Oxford Global Resources,* at *2.

Likewise, confidential client data is a trade secret protected under Texas law, whether by express contract or by common law. *Propath Servs., L.L.P. v. Ameripath, Inc.,* 2004 U.S. Dist. LEXIS 27846, *13 (N.D. -- Tex. October 21, 2004). The data CSI seeks to protect cannot be generally known by others in the same business or readily ascertainable by an independent investigation as it is derived entirely from the history of CSI's dealings with clients by which CSI has ascertained preferences, quirks and pricing keys.  See *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Davis,* 1998 U.S. Dist. LEXIS 20674, *3 (N.D.--Tex December 30, 1998), and cases cited therein. Loss of confidentiality over client data is irreparable injury under Texas law. *Merrill Lynch*, 1998 U.S. Dist. LEXIS 20674, *10.

### 3. *The Threatened Injury*

CSI must show that the injury it will suffer if denied injunctive relief is greater than the injury the defendant will suffer if that relief is granted. *Erotique Shop, Inc. v. City of Grand Prairie,* 2006 U.S. Dist. LEXIS 82065, *14 (N.D. Tex., Nov. 9, 2006). Andrews and her new employer have rendered this decision easy by insuring her income and employment in anticipation of this litigation, precisely to mitigate the injury of an adverse outcome. *See Tran. 65/5 through Tran. 68/2.* Andrews will have work and a guarantee of no financial loss regardless of the outcome. Indeed, she specifically negotiated her compensation from DecisionQuest taking into account the possibility that she would have to honor her obligations under her contract with CSI. *Id.[8]*

Meanwhile, CSI has already taken losses in its client list, and consequent losses of financial well-being and market position, because of breaches by Andrews. *See, Tran. 165/19 through 166 /18; Tran. 275/11 through 282/16* . CSI will likely continue to suffer losses if Andrews continues to use insider information in competition for common existing and potential clients.  *See, id.* Given the specific

---

[8] In the hearing, DecisionQuest emphasized that this enforcement of her CSI agreement disqualifies her from representing a capital defendant in Chicago. The Court does not take that lightly; indeed, there has been debate whether capital defendants should be entitled to jury consultants under *Ake v. Oklahoma*, 470 U.S. 68 (1985). *See, e.g, Comment: A Process Right Due? Examining Whether A Capital Defendant Has A Due Process Right To A Jury Selection Expert*, 53 Am. U.L. Rev. 1143 (2004). However, enforcement here does not deprive any defendant anywhere of competent expert assistance, whether by entitlement or choice. As with psychiatric experts and legal counsel, even if a capital defendant were entitled to competent assistance from a jury consultant, (s)he would not be entitled to a specific individual. *Ake,* 470 U.S. 68, 83 (The Supreme Court does not "say ... the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking ... [but rather that he must] have access to a competent psychiatrist ...."). Should that right ever be extended to jury consultancy, it is clear from the evidence that DecisionQuest has ample resources to provide any such representation without Dr. Andrews.

terms of her DecisionQuest agreement, however, if this injunction is granted

Andrews will still "be permitted to compete against [CSI] and practice [her]

profession" so that "[a]ny harm to [her[ does not outweigh the losses [CSI] will incur

in lost customer goodwill, trade secrets, and lost business if the injunction is not

granted." *Merrill Lynch,* 1988 U.S. Dist. LEXIS 20674, *10; *see Tran. 65/5 through*

*Tran. 68/2.*

### 4. *The Public Interest*

The "public interest" element has been notoriously ill defined over decades of

litigation, often addressed with no more than a summary sentence.  Both sides are

thus able to present strong arguments on the element.

Generally, public policy in our market economy favors free alienability of

professional services and the ready interchange of ideas. The common law has

famously viewed covenants restricting the range of future employment with

skepticism since *Dyer's Case,* Y.B. Mich. 2 Hen. 5, fol. 5, pl. 26 (C.P. 1414).

Contemporary scholars have also been critical of covenants restricting professional

and technical services providers from applying the full range of their acquired

knowledge and skills,[9] and some states (such as California, with its volatile "Silicon

Valley" economy in mind)[10] have substantially forsworn restrictive covenants.

---

[9] *See, The Law and Economics of Employee Information Exchange in the Knowledge Economy,* 12 Geo. Mason L. Rev. 651, 652 n.4 (2004), and sources cited therein.

[10] *See, e.g.,* Cynthia L. Estlund, *Between Rights And Contract: Arbitration Agreements And Non-Compete Covenants As A Hybrid Form Of Employment Law*, 155 U. Pa. L. Rev. 379 (2006); Joan T.A. Gabel and Nancy R. Mansfield*, The Information Revolution And Its Impact On The Employment Relationship: An Analysis Of The Cyberspace Workplace*, 40 Am. Bus. L.J. 301 (2003); Ronald J. Gilson, *The Legal Infrastructure Of High Technology Industrial Districts: Silicon Valley, Route 128, And Covenants Not To Compete,* 74 N.Y.U.L. Rev. 575 (1999).

However, another prerequisite to healthy commercial activity is that contracts provide either performance or protection from the consequences of breach. While unconscionable prohibitions on alienability of labor may be subject to negation, the contractual arrangement to which Andrews agreed is well within the realm of reason outlined by a review of relevant case law. *See Merrill Lynch,* 1988 U.S. Dist. LEXIS 20674, *10, and cases cited therein.

Further, Andrews made it very clear at the hearing that she does not believe she learned anything of value as a professional during her time at CSI. By her own assessment, then, there is no penalty to the expansion of knowledge in the market, and thus no loss to the public interest, if she is restricted from relying upon any of it.

The Court is also strongly persuaded toward enforcement as being within the public interest given the present stance and direction of the Texas Supreme Court on this issue. While enforcement was arguably in disfavor when *Light* was decided in 1994, it has become apparent that Texas public policy as established by statute and enforced by that Court not only favors but requires enforcement under the particular factual circumstances found here. *See Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 2009 Texas LEXIS 124 (Tex. April 17, 2009); *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson,* 209 S.W.3d 644 (Tex. 2006); *compare Light v. Centel Cellular Co.*, 883 S.W.2d 642 (Tex. 1994).

As this case law illustrates, the Texas legislature has been very carefully and deliberately crafting the enforceability of restrictive covenants over the years,[11]

---

[11] The detailed crafting of restrictive covenant law and policy in Texas has been relatively intensive and its history well documented. *See, e.g.,* Shana L. Burleson and David R. Clouston, *Light Dimmed by Johnson - The Enforceability of Covenants Not to Compete under*

down to the present day.[12]  The history behind *Mann Frankfort* and *Sheshunoff*

clearly establishes the public interest in Texas as the legislature intends.[13] The

public interest is best protected by enforcement of the law as has been expressed by

the legislature and illuminated by the Texas Supreme Court. Certainly, "[t]he Court

finds no reason to believe that granting the preliminary injunction will *disserve* the

public interest." *Propath Servs., L.L.P. v. Ameripath, Inc.,* 2004 U.S. Dist. LEXIS 27486,

*24 (N.D. – Tex. October 21, 2004) (Emphasis added).

### C. CONCLUSIONS OF LAW

The Court finds as a matter of law that:

1.　　　　Movant CSI has established a substantial likelihood of prevailing on

　　　　　the merits of this case.

2.　　　　Movant CSI has established that there is a substantial threat CSI will

　　　　　suffer irreparable injury if the injunction is not granted;

3.　　　　Movant CSI has established that that the threatened injury to the

　　　　　CSI outweighs whatever damage the proposed injunction may cause

　　　　　Andrews, the opposing party;

---

*Texas Law,* 59 Baylor L. Rev. 287 (2007);  Michael D. Paul and Ian C. Crawford, *Refocusing Light: Alex Sheshunoff Management Services, L.P. v. Johnson Moves Back to the Basics of Covenants Not to Compete,* 38 Mary's L.J. 727 (2007); Charles M. Hosch and Lauren T. Becker, *Business Torts*, 60 SMU L. Rev. 713 (2007); Ted Lee & Leila Ben Debba, *Backdoor Non-Competes in Texas: Trade Secrets*, 36 St. Mary's L.J. 483, 503-06 (2005)*; Comment: The Story of Covenants Not to Compete in Texas Continues ...,* 33 Hous. L. Rev. 913 (1996).
[12] The Texas Senate recently passed a bill, now pending before the Texas House, that modifies the application of restrictive covenants regarding medical professionals. *See, An act relating to covenants not to compete by physicians,* 2009 Bill Text TX S.B. 1713.
[13] The Legislature enacted the current statute in direct response to a contrary 1987 decision under then-existing common law by the Texas Supreme Court. *See, Hill v. Mobile Auto Trim, Inc.*, 725 S.W.2d 168, 171-72 (Tex. 1987); *compare, Tex. Bus. & Com. Code Ann. §§15.5*0-51.

4.      Movant CSI has established that granting the injunction is not
        adverse to the public interest;

5.      The Court finds these matters of law to have been proven
        independently; moreover, the Court finds that while they may vary
        in weight separately, together they harmonize to produce a
        convincing case for granting a preliminary injunction against
        Andrews on behalf of CSI;

6.      Disregarding the restrictive covenants, the Court finds that an
        otherwise enforceable agreement existed between Andrews and
        SCI as each party exchanged multiple enforceable promises;

7.      The Court finds further that the restrictive covenants were ancillary
        to this otherwise enforceable agreement;

8.      The Court finds that the restrictive covenants enforced the interests
        of the employer that resulted from their disclosing confidential
        information to Andrews.

9.      The following are trade secrets and confidential information
        belonging to CSI that are protected under their restrictive
        covenants with Andrews:

    a.   The specific contacts with whom CSI communicates with current
         and prospective clients;

    b.   The history of CSI's dealings with its clients, including price details
         and other negotiated terms;

c.   Confidential information consisting of data, relationships, technology or techniques, which have been developed or recorded by CSI and that are not publicly available information, including but not limited to the research and findings of CSI regarding irrelevancy of using repeat jurors, and CSI's specific methods of witness preparation, as well as identity of clients and prospects; special needs of clients; confidential market studies; pricing studies, information, and analyses; business projections; financial information; special procedures and services of CSI; client databases, employer manuals; contracts; fee arrangements; correspondence with clients and prospective clients; profiles of CSI; profiles of clients; marketing strategies; CSI reference materials; activity reports; and other CSI training and materials;

10.   CSI has the right to enjoin Andrews based on the restrictive covenants within her contract; and,

11.   The consequent injunction must be tailored to those terms, the evidence before the Court and the Court's duty to craft an injunction that meeting the legitimate interests of the protected without depriving the market of services that may be offered without damage to those protected interests.

### D. ORDER FOR PRELIMINARY INJUNCTION

The Court **ORDERS** that a **preliminary injunction** consistent with this Order and Opinion be entered against Andrews.

Therefore, until final resolution of this lawsuit's plea for a permanent injunction, Andrews is enjoined from:

1.  Any solicitation or conduct of business with CSI's clients of past, or existing, status on January 17, 2009, so as to avoid her possible use of confidential information to which she has had access;

2.  Any disclosure of, or reliance upon, any confidential information or trade secrets obtained while in the employ of CSI, including data, relationships, technology or techniques, which have been developed or recorded by CSI and that are not publicly available information, including but not limited to the research and findings of CSI regarding irrelevancy of using repeat jurors;[14] CSI's specific methods of witness preparation, the identity of clients and prospects; special needs of clients; confidential market studies; pricing studies, information, and analyses; business projections; financial information; special procedures and services of CSI; client databases, employer manuals; contracts; fee arrangements; correspondence with clients and prospective clients; profiles of CSI; profiles of clients; marketing strategies; CSI reference materials; activity reports; and other CSI training and materials;

3.  Any participation in witness training, jury focus groups, mock trials, jury simulations or jury research projects on any particular litigation project

---

[14] While she disagrees with the findings, and is therefore unlikely to utilize the methodology, she is also restricted by this clause of the injunction from revealing anything she knows of CSI research into and findings concerning the matter.

or other matter that Andrews worked on from January 17, 2007, through January 17, 2009;

4.  Any solicitation of business in trial science consultancy from any individual or entity who was a CSI client from January 17, 2007, through January 17, 2009, or from any individual or entity she had contacted regarding provision of those services during that same period;

5.  Any interference with employment relationships within CSI, including any direct or indirect involvement in recruiting then current employees away from CSI, for a period from January 17, 2009 through January 17, 2011; ***AND, FURTHER, ANDREWS IS ENJOINED TO MAKE***:

6.  The return to CSI by 5:00 p.m., Central Standard Time, Wednesday, May 13, 2009 of any reports, electronically stored data, media of electronic storage, property or other materials, including computers, laptops, notebook computers, PDAs, cell phones, or any computer device that Andrews used for business purposes while employed by CSI, that she possesses, controls or to which she had access as a result of her employment by CSI;

7.  A written Notice of Account, filed in the case, and describing to this Court by written submission by 5:00 p.m., Central Standard Time, Wednesday, May 13, 2009, detailing what has been returned to CSI from January 17, 2009 through the date that Notice is filed;

8.  A written Notice of Account, filed in the case, and describing to this Court by written submission by 5:00 p.m., Central Standard Time, Wednesday, May 13, 2009, regarding any such property, electronically stored data, media for

electronic storage, reports or other materials, including computers, laptops, notebook computers, PDAs, cell phones, or any computer device that Andrews used while employed by Plaintiff to which she had access as a result of her employment by CSI and to which she has given control or access by any other individual or entity, identifying the property and its current location or possessor. If no such property remains, Andrews will file a Notice of Account stating that fact; ***AND,***

**FURTHER, THE COURT ORDERS THAT:**

9. The documents provided by CSI under seal for in chambers review, which identified the clients and prospects that would be covered under enforcement of the Andrews Contract, will **REMAIN UNDER SEAL** and be **FILED UNDER SEAL,** as an appendix to this Memorandum, Order and Injunction, denominated by the Clerk of this Court as "**03:09-CV-251-O CSI v. Andrews Confidential Appendix Under Seal**." Access to the contents of the file is granted to legal counsel for DecisionQuest, who may make visual inspection, written notes and/or recorded oral dictation based on the contents but may not copy those contents. The only lawful use of the information therein by said counsel will be in advising Andrews and DecisionQuest on how to avoid violation of this injunctive order. Access to the contents of the file is granted to legal counsel for CSI for visual inspection, written notes, recorded oral dictation, and photocopying.

**<u>FURTHER, THE COURT ORDERS THAT</u>:**

10. The bond posted by CSI in the state case, since removed into this Court and
    now present before the Court, shall remain posted accordance with CSI's
    responsibilities under Fed. R. Civ. P. 65(c).

11. If Andrews deems the bond amount insufficient, she may apply to this Court
    by written motion supported by a brief and written evidence for a higher
    bond, provided these are submitted by 5:00 p.m., Central Standard Time,
    Wednesday, May 13, 2009. At that point, local rules will govern the response
    and reply procedures.

**IV. <u>DISPOSITION</u>**

For the reasons stated above and on the Order made, the plaintiff's motion
for a preliminary injunction is **GRANTED.**

**SO ORDERED this 11th day of May, 2009.**


_____
**Reed O'Connor**
**UNITED STATES DISTRICT JUDGE**